IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ALICE G. TURNER,
     Plaintiff,

vs.                                    Case No. 5:07cv9/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

I.      PROCEDURAL HISTORY

This suit involves two applications made under the Act, one for DIB (Tr. 46–48),[1] and one for SSI (*id.*).  Plaintiff's applications were denied initially (Tr. 21–22, 25–26) and on reconsideration (Tr. 23–24, 31–33).  On February 2, 2006, an administrative law judge (ALJ) rendered a decision in which he found that Plaintiff was not under a "disability," as defined in the Act (Tr. 12–20).  On November 9, 2006, after considering additional information (*see* Tr. 235–45), the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4–7).  Thus, the ALJ's decision stands as the final decision of the Commissioner, subject to review in this court. Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

On February 2, 2006, the ALJ made several findings relative to the issues raised in this appeal (*see* Tr. 12–20):

    1)    Plaintiff met the disability insured status requirements of the Act through December 31, 2006.

    2)    Plaintiff has not engaged in substantial gainful activity (SGA) since June 14, 2004, the amended alleged onset date of her disability (*see* Doc. 11 at 2).

    3)    The medical evidence establishes that Plaintiff has impairments which are considered "severe" within the regulatory definition, including joint pain, fatigue, and weakness associated with fibromyalgia, coronary artery disease, and depression/adjustment disorder.

    4)    Plaintiff's allegations related to pain are not totally credible or supported by the medical evidence.

    5)    Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appx. 1, Subpart P, Regulations Numbers 4 and 16.

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on April 2, 2007 (Doc. 8).

6)      Plaintiff has the residual functional capacity (RFC) to perform a minimally restricted range of light work[2] (20 C.F.R. §§ 404.1567 and 416.967).[3]

7)      Plaintiff is able to perform her past relevant work.

8)      Plaintiff was not under a "disability," as defined in the Act, at any time through February 2, 2006, the date of the ALJ's decision.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

_____

[2]Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[3]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that Plaintiff is not only unable to do her previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, she is not disabled.

2.      If the claimant is not performing SGA, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing SGA and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment,

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[4]

A.      Personal/Employment History

At her hearing before the ALJ, Plaintiff testified that she was forty-seven years old with a tenth-grade education.  She spoke clearly and had no apparent problems reading, writing or communicating.

She described her past work as a sales clerk and cashier for a business called Joyce's Touch of Class.  She described an abusive working environment where she was required to stand all day and do things like stock shelves and cash out customers.  She indicated that she was the only employee for three years and that the employer would not give her a day off to see a doctor, even though she was having blood pressure problems.  She complained at that time of feeling "drained" and wanting to see a doctor, but according to her testimony, she could not get a day off from work.

She also discussed in some detail an automobile accident that she had in 1992.  She indicated that she has a plate and six screws in her left arm.  She stated that she was stable for a while, but her arm is giving her trouble again.  She also stated that she wants to go back to the doctor, but she can not because the bill was not paid in full by the Department of Vocational Rehabilitation and Medicaid.[5]

Plaintiff testified that she has crying spells because she does not know what to do at this point.  She said that she is unable to work because of constant pain and fatigue, and she is very frustrated by her condition.  She noted that she hurts all over her body, every day, from morning to night.  She described her symptoms and limitations as:  hurting "from head to toe," chest pain and

---

[4]Unless otherwise indicated, the information in this section is derived from the opinion of the ALJ (see Tr. 12–20).

[5]The ALJ noted that Plaintiff's explanation is somewhat at odds with her allegation that she has not sought assistance from vocational rehabilitation (see Tr. 15).

"sweat popping out," feeling achy all over, problems with her left arm due to a metal plate and screws, sitting and crying a lot, unable to sit for long periods, unable to lie still, unable to stand for long periods, unable to function a full day, sensitive to touch, and headaches (Tr. 253, 256–60, 262–63, 266–68, 270).  She stated she cannot even walk to the mailbox anymore because "I get halfway there and I give out," "I don't have the energy to get there.  I hurt so bad and my knees buckle." (Tr. 261).  She rated her pain level as a "10" (Tr. 269).

Plaintiff was asked about her daily activities and stated, "I feel pretty useless.  I don't do anything," "I lie down a lot during the day," or she sits at her computer and reads a little (Tr. 263, 270).  She also indicated that she will do a few dishes and laundry for short periods of time.  She has a good day once in a while, and on those days, she will do a little more.  She has a driver's license and drives when she feels up to it.

B.	Relevant Medical History

Plaintiff's treating source is Dr. Luzviminda Ordonez at the Family Practice facility.  She has assessed Plaintiff with coronary artery disease, hypertension, hypercholesterolemia, and fibromyalgia.  Her records show that Plaintiff's blood pressure fluctuates up and down, but when she takes her medications she is stable at 124/70 (Tr. 183–206).  In Dr. Ordonez's records, Plaintiff's heart and lungs are consistently noted as clear and normal in rhythm.  She has no joint swelling or deformity.  As noted by Plaintiff, however, she consistently complained to Dr. Ordonez of pain related to her fibromyalgia, as well as other symptoms associated with fibromyalgia (*see* Doc. 11 at 5).  She is prescribed some pain killing medication, but according to her testimony, her doctor is reluctant to give it to her.  It would be her preference that Plaintiff attend a pain clinic.

Upon referral from Dr. Ordonez, Plaintiff was seen by pain specialist, Robert J. Joseph, M.D., on September 18, 2002 (Tr. 209–13).  Dr. Joseph noted Plaintiff's symptoms and history, including an automobile accident in 1989 when Plaintiff dislocated both shoulders; fractured her left arm, which required a metal plate; injured her left leg; and had a pneumothorax (Tr. 209–11).  Dr. Joseph also referenced x-ray reports showing degenerative changes in the lower lumbar spine, reflecting degenerative disc disease (Tr. 210).  Plaintiff described her "usual pain level" as a "7" on a ten-point scale, "making normal function difficult most of the time" (*id.*).  Plaintiff next saw Dr. Joseph in June 2004, at which time she rated her pain at a "10," noting that she basically had pain everywhere (Tr. 207–08).  Dr. Joseph opined that Plaintiff had "severe fibromyalgia," for which she

is dependant on narcotic treatment, and when combined with her other impairments (i.e., heart stents, hypertension, depression, and osteoarthritis) she is "disabled at this time and is unlikely to work" (Tr. 208).

On August 29, 2005, after seeing Plaintiff only two times, Dr. Joseph completed a Fibromyalgia RFC Questionnaire (Tr. 228–32).  He noted that Plaintiff had been diagnosed with fibromyalgia and that her condition has (or could be expected to) lasted for at least twelve months (Tr. 228).  He also noted that Plaintiff had fifteen of twenty-four symptoms that are associated with a diagnosis of fibromyalgia, as well as pain in most areas (Tr. 228–29).  Dr. Joseph opined that Plaintiff's pain was "severe enough to 'often' interfere with attention and concentration," making her incapable of even "low stress" jobs (Tr. 229).  He noted that Plaintiff would suffer only "minimal" side effects from her medications (*id.*).  Regarding functional impairments, Dr. Joseph estimated the following:  Plaintiff can walk for only less than a city block; she can sit in thirty-minute increments and stand in fifteen-minute increments, but she is unable to sit or stand more than a total of two hours in an eight-hour workday; she needs to walk at least ninety minutes a day in at least five-minute intervals; she needs a job that permits shifting positions "at will," such as from sitting, standing, or walking; she needs to take unscheduled breaks, but Dr. Joseph did not indicate how often or long she would need to do so; she can occasionally lift less than ten pounds; she has significant limitations in repetitive reaching, handling, or fingering; she cannot stoop or crouch; she will have "good days" and "bad days"; and she will, on average, be absent from work more than four times a month due to her impairments or treatment therefor (Tr. 230–31).  On September 13, 2005, Dr. Joseph opined that Plaintiff is disabled based on diagnoses of fibromyalgia, hypertension, anxiety, and mild coronary artery disease (Tr. 233).

C.      Other Information Within Plaintiff's Claim File

On March 24, 2003, and September 18, 2003, State Agency reviewing physicians opined that, despite Plaintiff's medically determinable impairments, she retained the physical ability to perform the exertional demands of at least light work as that term is defined in the Regulations (*see* Tr. 118–25, 144–51).

When seen by State Agency consultative examiner John E. Hord, Ph.D., on November 18, 2003, Plaintiff denied any previous mental health treatment.  Plaintiff discussed her activities and indicated that she likes to try and do some lawn work (an activity Plaintiff did not mention in her

testimony before the ALJ).  She also indicated that she spends time with her grandchildren, and she was noted to be neat and clean, which in the ALJ's opinion, indicated the ability to take care of her personal needs.  Plaintiff was wholly appropriate in the examination and told the doctor that she had some depression only "occasionally."  Plaintiff was assessed with an adjustment disorder with depression and assigned a Global Assessment of Functioning (GAF) rating of 68[6] (Tr. 152–54).

Psychologist Jane F. Cormier, Ph.D., completed Mental Residual Functional Capacity Assessment and Psychiatric Review Technique forms on December 12, 2003 (Tr. 155–68).  She noted that Plaintiff had an affective disorder (i.e., adjustment disorder with depression and/or occasional anxiety), but it was non-severe, and the evidence did not establish the presence of the "B" or "C" criteria of Listing 12.04 (Tr. 155, 158, 165–66).  Regarding the "B" criteria, Dr. Cormier found no restriction of activities of daily living or episodes of decompensation of extended duration, and only a mild degree of difficulty in maintaining social functioning, concentration, persistence, and pace (Tr. 165).  A second agency psychologist reached similar conclusions (*see* Tr. 169–82).

Psychiatrist John R. Billingsley, M.D., conducted a psychiatric evaluation on January 5, 2005, at the request of Plaintiff's attorney (Tr. 214–23).  He opined that Plaintiff had severe depression secondary to her medication condition, but no significant anxiety symptoms.  Dr. Billingsley also noted that due to Plaintiff's multiplicity of problems, which include her heart condition and stenting, fibromyalgia, and now depression, that she is "totally disabled" (Tr. 214).  On the evaluation form which sets forth the criteria for Affective Disorder, Listing 12.04, Dr. Billingsley endorsed eight of the nine symptoms characterizing Depressive Syndrome (Tr. 219).  He also specified that Plaintiff is markedly restricted in daily activities, maintaining social functioning, and in concentration, persistence or pace, resulting in a markedly limited ability to respond appropriately to supervisors, co-workers, and the general public, deal with changes in the work setting, and carry out detailed instructions (Tr. 222–23).

---

[6]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.*

Finally, Donna Mancini, a vocational expert (VE), testified at Plaintiff's hearing before the ALJ on September 12, 2005 (Tr. 246, 270–73). She identified Plaintiff's past work as a sales clerk and cashier/wrapper, and noted that each position was classified as "light" and "semiskilled" (Tr. 271). The VE first testified that an individual capable of performing the full range of light work could perform Plaintiff's past work. Next, the VE was asked a hypothetical question, and she was asked to presume that the hypothetical individual in the question was the same age, and had the same education and work experience as Plaintiff, but needed a "sit/stand" option (*id.*). In response, the VE noted that such a person could perform some cashiering positions because some of those positions have a stool and permit a person to alternate between sitting and standing (*id.*). However, the person could not return to Plaintiff's position at Joyce's Touch of Class, because according to Plaintiff's testimony, she was not permitted to sit at that job (*see* Tr. 271–72). However, the VE noted that a person with the hypothetical limitations could perform sedentary jobs that offered a sit/stand option, such as "order clerk food and beverage" (sedentary and unskilled), call out operator (a dispatcher-type position, which is also sedentary and unskilled), and pari-mutuel ticket taker (sedentary and unskilled) (Tr. 272). In the light category, the person could perform the job of toll collector (light and unskilled) (Tr. 272–73). The VE indicated that these jobs would allow the worker to sit and stand at will, and she testified about the availability of such jobs in both the national and regional economies (*see id.*).

V.     DISCUSSION

Plaintiff raises four issues on appeal. First, Plaintiff contends the ALJ erred in finding that she could return to her past relevant work as a cashier (Doc. 11 at 2). Next, Plaintiff asserts that the ALJ's alternate finding, that she could perform other work existing in the economy, is in error because it was based on the VE's answer to a hypothetical question that failed to include all of Plaintiff's limitations (*id.*). Plaintiff additionally contends that the ALJ failed to accord adequate weight to the opinion of Dr. Joseph, and finally, erred in failing to properly evaluate Plaintiff's depression (*id.*).

A.     Evaluation of Dr. Joseph's Opinion[7]

---

[7]For organizational purposes, Plaintiff's arguments have been rearranged.

Dr. Joseph, a pain specialist, opined that Plaintiff could not sustain work activity.  Plaintiff contends that the ALJ erred in discounting this opinion, claiming that Dr. Joseph was a "treating pain specialist," and his opinion was therefore entitled to significant, if not controlling, weight (*see* Doc. 11 at 13–19).  Plaintiff additionally contends that the ALJ did not properly consider Dr. Joseph's fibromyalgia diagnosis (*id.*).

To analyze Plaintiff's claims regarding Dr. Joseph, it must first be determined whether he is properly considered a "treating" source.  As noted above, Dr. Joseph saw Plaintiff on only two occasions, once in September 2002, and once in June 2004.  At Plaintiff's first visit, Dr. Joseph summarized Plaintiff's treatment history with Dr. Ordonez, noting that Plaintiff had been treated conservatively and that x-rays ordered by Dr. Ordonez showed mild degenerative change in the lower lumbar spine and minimal degenerative disc disease in the lower thoracic spine (Tr. 209–10).  Dr. Joseph also recorded Plaintiff's subjective complaints of pain (*id.*).  Next, Dr. Joseph conducted a physical examination, finding in pertinent part that Plaintiff was in no apparent distress, had full range of motion of the neck and lumbar spine, normal posture of the cervical spine, negative straight leg raising in the sitting position, 5/5 motor strength in her upper and lower extremities, "2+ and symmetrical reflexes," and no cyanosis, clubbing, or edema in her extremities (Tr. 212).  However, Plaintiff did have lower cervical facet tenderness, trigger point tenderness, extreme sensitivity to palpation over the lower lumbar facets, and she was very tender "just about everywhere" to palpation over the lumbar spine (*id.*).  Dr. Joseph noted that Plaintiff was having "a pretty severe chronic pain syndrome probably fibromyalgia" (*id.*).  He further noted that Plaintiff had fifteen "tender points" and therefore "meets the diagnosis for fibromyalgia" (*id.*).[8]  Next, Dr. Joseph opined that Plaintiff's focal tenderness over the "cervical facet joints of C5–6 bilaterally over [what Dr. Joseph thought to be] lumbar facet tenderness" was in addition to Plaintiff's "fibromyalgia type pain" (*id.*).  Dr. Joseph advised that the medical regimen provided by Dr. Ordonez was "very reasonable" and should be continued, except to suggest that Plaintiff should increase her dosage of

---

[8]The American College of Rheumatology has developed diagnostic criteria by which a person can be affirmatively diagnosed with fibromyalgia if he or she has widespread pain in combination with tenderness in at least eleven of eighteen specific tender point sites.  *See* National Institute of Arthritis and Musculoskeletal and Skin Diseases, Questions and Answers About Fibromyalgia (1999), available at http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (last visited January 7, 2008).

Neurontin and perhaps be prescribed an antidepressant (Tr. 213).  Dr. Joseph seemed concerned about the level of narcotic medication Plaintiff was taking, and he questioned whether strong opiate medication was helpful or hurtful to her (*id.*).  Finally, Dr. Joseph specifically noted that he would see Plaintiff "on an as needed basis as I think she is going to be following up with Dr. Ordonez long term and this is just [a] consultation" (*id.*).

Plaintiff did not return "as needed," nor did she see Dr. Joseph again until approximately twenty months later, on June 14, 2004, when "Dr. Ordonez sent her back," and Dr. Joseph stated that Plaintiff was "back today as a courtesy consult to Dr. Ordonez" (Tr. 207–08).  Dr. Joseph noted that Plaintiff was still being treated by Dr. Ordonez and that her treatment continued to be conservative (Tr. 207).  Dr. Joseph again reported Plaintiff's subjective complaints of pain, but he did not conduct a physical examination, and he stated that he was "not really sure what [he could] do right now" for Plaintiff (*id.*).  He discussed Plaintiff's options with her, noting that she would have to decide which course she wished to follow.  Dr. Joseph concluded by stating that if Plaintiff "would like for us to follow her we can go ahead and manage that," and alternatively, he "d[id] not have much to offer" Plaintiff (*id.*).

As noted by Plaintiff (*see* Doc. 11 at 18), the regulations define treating medical sources as:

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).  We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.

20 C.F.R. § 404.1502.

Based on the foregoing, the court concludes that Dr. Joseph was not a treating source. Initially, Dr. Joseph himself noted that his appointment with Plaintiff was "just a consultation," which is an accurate characterization, as he clearly had no "ongoing treatment relationship" with Plaintiff.  Dr. Ordonez, on the other hand, was obviously a treating physician who simply referred

Plaintiff to Dr. Joseph for an opinion.  Dr. Joseph did not prescribe medication, and he did not "treat" Plaintiff, even though he indicated when he first saw Plaintiff that she could return to him "as needed," but she never did.  Although Plaintiff has emphasized that a treating source can be a source who has seen a claimant "only a few times or only after long intervals (e.g., twice a year)" (*see* Doc. 11 at 18), this does not establish that Dr. Joseph was a treating source.  He did not see Plaintiff twice a year on a continuous basis; indeed, he saw her only a total of two times, and he did not even see Plaintiff a "few times" as contemplated in the Regulations — Plaintiff's second visit was merely that, "a visit"; she was not examined or treated, and she appeared only because Dr. Ordonez sent her there.  Although Dr. Joseph discussed treatment options with Plaintiff, he did not recommend any specific course, he indicated that she would have to decide which course to follow, and he again noted that she could return to him if she so desired, but she never did.

Thus, Dr. Joseph is not a treating source, and his opinion is comparable to that of a one-time consultative examiner and should have been evaluated accordingly.  *See* 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining (Dr. Joseph was an examiner, and his opinions are given more weight than those of a non-examining source); treatment relationship (treating sources are given more weight), including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

Here, the ALJ discounted the opinions of Dr. Joseph (*see* Tr. 18).[9]  In doing so, the ALJ noted that Dr. Joseph saw Plaintiff only for a consultation, he relied "substantially" on Plaintiff's subjective allegations, and he did not have the opportunity to see her over a period of time (Tr. 18). Indeed, as discussed above, Dr. Joseph was a consultative examiner, and he conducted a physical examination of Plaintiff on only one occasion in September 2002, which was prior to Plaintiff's amended alleged onset of disability.  Although Plaintiff exhibited trigger point tenderness, consistent with a diagnosis of fibromyalgia, her physical examination was otherwise unremarkable.  Thus, it

---

[9]Although the ALJ incorrectly referred to Dr. Joseph as "Dr. Stewart," it is clear he was referring to Dr. Joseph, as he specifically referenced Exhibits 12F and 13F, which are reports prepared by Dr. Joseph (*see* Tr. 3, 18, 228–32).

does appear that Dr. Joseph's opinions were "substantially" based on Plaintiff's subjective allegations, especially considering that Plaintiff was not examined by Dr. Joseph on her second visit in June 2004, and Dr. Joseph concluded at that time (and later, in August 2005) that Plaintiff was unable to work — after having examined her once, more than a year and a half (to three years) earlier.  As noted by the ALJ, however, Plaintiff's subjective allegations were inconsistent with other evidence of record, including her ability to do things "around the house," drive, do lawn work, interact with her grandchildren, and take care of her personal needs (*see, e.g.*, Tr. 18; 153 (describing yard work);106, 153, 260, 263 (describing interaction with her grandchildren); 267–68 (noting her ability to drive); *see also* Tr. 105 (describing daily activities)).  Although Plaintiff's descriptions of her activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning her activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Furthermore, the ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  The ALJ additionally noted that Dr. Joseph's opinion was solicited by her attorney.  Although Plaintiff's first visit to Dr. Joseph was not arranged or solicited by her attorney, but rather was a referral from Dr. Ordonez, Dr. Joseph did not render the opinions at issue at Plaintiff's initial visit (*see* Tr. 209–13 (notes from September 2002 consultation)).  He rendered the opinions later at the request of Plaintiff's attorney, and on a form supplied by Plaintiff's attorney (*see* Tr. 250).[10]

The ALJ also rejected Dr. Joseph's opinion because it was not consistent with the record as a whole (Tr. 18).  *See* 20 C.F.R. § 404.1527(d)(4) (the more consistent an opinion is with the record as whole, the more weight it is given).  Initially, a State agency medical consultant noted that Plaintiff's physical examination on July 8, 2003, was essentially unremarkable, showing no edema and no deformities (Tr. 15, 145), and second agency consultant similarly found that Plaintiff was capable of performing the exertional demands of at least light work (Tr. 118–25).  *See* 20 C.F.R. § 404.1527(f)(1) (evidence from non-examining sources must also be considered).  Moreover, on September 13, 2005, Dr. Joseph opined that Plaintiff was permanently disabled, but on August 29,

---

[10]One of Dr. Joseph's opinions (i.e., that Plaintiff could never return back to work) was rendered on September 13, 2005, one day after Plaintiff's hearing before the ALJ (*see* Tr. 233, 246).  However, the opinion appears to have been considered by the ALJ, as it (Exhibit 13F) was specifically referenced in the opinion (*see* Tr. 18).

2005, he stated that Plaintiff's prognosis was "fair" (Tr. 228, 233).  Additionally, Dr. Joseph opined that Plaintiff's pain would only "often" interfere with her attention and concentration, as opposed to "frequently" or "constantly" — which conflicts with Plaintiff's allegations of constant pain and "hurting all the time" (Tr. 229, 262, 270).  Furthermore, Plaintiff indicated that her medications make her dizzy, nauseous, and sleepy, but Dr. Joseph noted that any side effects from Plaintiff's medications would be "minimal" (Tr. 105, 229).  Thus, although Dr. Joseph indicated that he found Plaintiff's allegations credible (*see* Tr. 228–29), his limitations are not as severe as Plaintiff alleged, and the conflict is unexplained.  Moreover, in the assessment dated August 29, 2005, Dr. Joseph opined that Plaintiff could sit thirty (30) minutes and stand for fifteen (15) minutes at one time, and in an eight-hour workday she could sit and stand/walk for a total of less than two hours (Tr. 230).  Dr. Joseph further opined, however, that Plaintiff needed to walk every ninety (90) minutes for at least five (5) minutes and that she also needed a sit/stand option (*id.*).  It appears then, that if Plaintiff only needed to walk "every ninety minutes," she must have been able to sit longer than thirty minutes, and the suggested limitations are therefore inconsistent.  Finally, even though Dr. Joseph opined that Plaintiff would miss work for health-related reasons more than four times a month, he did not explain why this would be necessary (Tr. 231).  A brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980); Johns v. Bowen, 821 F.2d 551, 555 (11th Cir. 1987).

Although Dr. Joseph specifically opined that Plaintiff could not work (*see* Tr. 229 (opining that Plaintiff is incapable of "even 'low stress' jobs"), Tr. 233 (opining that Plaintiff is disabled "indefinitely" and will never return back to work)), it was proper for the ALJ to discount these opinions because the question of whether a claimant is disabled (that is, unable to work within the strictures of the Act) is reserved to the Commissioner, not to a physician. *See* 20 C.F.R. § 404.1503. It is the physician's evaluation of a plaintiff's condition and the medical consequences thereof, "not their opinions of the legal consequences of his condition" on which the court must focus.  Lewis, 125 F.3d at 1436.  Thus, the ALJ properly noted that Dr. Joseph's opinion of "disability" is not binding on the Commissioner (Tr. 17).

In a related argument, Plaintiff contends that the ALJ did not properly consider Dr. Joseph's fibromyalgia diagnosis (Doc. 11 at 13–19).  Initially, the court notes that the ALJ discussed

Plaintiff's diagnosis of fibromyalgia in several areas of his opinion (*see, e.g.*, Tr. 15).  First, in noting Dr. Ordonez's diagnosis, the ALJ commented that "notably absent" from her records is documentation of Plaintiff's complaints, and although the ALJ was apparently discussing all of Plaintiff's impairments together (including hypertension, hypercholesterolemia, coronary artery disease, and fibromyalgia), he stated that Plaintiff is "known to have some pain and loss of energy, but the specific findings and supporting documentation required by the law is not in the record" (Tr. 15).  Specifically regarding the fibromyalgia diagnosis, the ALJ next stated that Plaintiff "does have a diagnosis and some medical treatment for fibromyalgia [and] [t]he existence of these facts is sufficient to establish a medically determinable impairment which could reasonably be expected to give rise to some pain," but not to the degree alleged by Plaintiff (Tr. 15–16).  Immediately thereafter, the ALJ again noted the lack of objective findings to corroborate Plaintiff's allegations regarding pain (Tr. 16).  Additionally, the ALJ noted:

> There is no evidence of such things as muscle atrophy or other similar clinical signs one would expect to see in situations where pain was so profound that it precluded the use of muscles.  The so called 'trigger points' associated with a fibromyalgia diagnosis are not well defined, and there appears to be at least two other explanations for her symptoms beyond fibromyalgia (car accident and depression).

(Tr. 17).

The diagnosis of fibromyalgia is difficult because the disease often lacks medical or laboratory signs and is generally diagnosed mostly on an individual's described symptoms.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  Thus, the Seventh Circuit has held that requiring positive laboratory findings is error in cases of this nature.  Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) (ALJ erred in finding claimant non-disabled because of lack of positive laboratory tests) (cited approvingly in Stewart v. Apfel, 245 F.3d 793 (11th Cir. 2001) (table), 2000 U.S. App. LEXIS 33214 (unpublished opinion)).  In Stewart, the court reviewed medical research on fibromyalgia, noting that it often lacks medical or laboratory signs, is generally diagnosed mostly on an individual's described symptoms, and its hallmark is a lack of objective evidence.  Thus, the ALJ's determination that a fibromyalgia claimant's testimony was incredible, based on the lack of objective evidence documenting the impairment, was reversed.  Stewart, 245 F.3d at 793, 2000 U.S. App. LEXIS 33214, at *9, n.4.  *See also* Moore, 405 F.3d at 1211 (reiterating the impropriety of focusing on the absence of objective findings corroborating claims of the impairment).

Other Circuits that have considered the issue have found that fibromyalgia is a disease that can serve as the basis for a medically determinable impairment, even without positive laboratory findings.  *See, e.g.*, Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); Preston v. Secretary of Health & Human Servs., 854 F.2d 815, 817–18 (6th Cir. 1988) ("Fibrositis [now fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances," and diagnosis involves testing for focal tender points.)  Indeed, the Commissioner has instructed that in cases of chronic fatigue syndrome, a condition that, like fibromyalgia, is based largely on self-reported symptoms, "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" is an example of a medical sign that establishes the existence of a medically determinable impairment.  Social Security Ruling 99-2p, 1999 WL 271569 (1999).

As noted by the Seventh Circuit, "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, 'Fibromyalgia Syndrome (ABC of Rheumatology),' 310 British Med.J. 386 (1995); Preston v. Secretary of Health & Human Servs., 854 F.2d 815, 818 (6th Cir. 1988) (per curiam), but most do not and the question is whether [Plaintiff] is one of the minority."  Sarchet, 78 F.3d at 307 (emphasis added).

In the instant case, the ALJ found that Plaintiff's fibromyalgia was a severe impairment, but he did not find it to be a disabling impairment.  However, in finding it non-disabling, the ALJ focused in large part on the very thing courts have cautioned against — a lack of objective medical findings.  Moreover, the ALJ referenced Plaintiff's documented trigger points as "so called" trigger points, suggesting to this court his lack of understanding regarding the meaning or significance of trigger points and that a medically accepted way of diagnosing fibromyalgia involves testing for focal tender points.  Thus, although the ALJ did not totally discount Plaintiff's diagnosis, he appears to have misunderstood how the disease is diagnosed and failed to appreciate that it can exist or cause disabling pain even in the absence of objective medical documentation.  Thus, the court concludes the ALJ erred in his consideration of Plaintiff's fibromyalgia diagnosis.

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find

facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223–24 (11th Cir.1991).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir.1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir.1991) ("The record . . . is fully developed and there is no need to remand for additional evidence."); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216–17 (11th Cir. 1991) (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

Here, the court cannot conclude that disability has been established without a doubt.  Indeed, as noted *supra*, the ALJ did not totally discount Plaintiff's diagnosis — he found it to be a severe impairment.  However, in concluding that it was a non-disabling impairment, the ALJ impermissibly focused on the lack of objective findings corroborating the disease.  Similarly, the ALJ considered the same factor, in part, in discounting Plaintiff's allegations of pain (*see* Tr. 17).  Although the ALJ provided other permissible reasons (e.g., activities of daily living, inconsistency with the record) for discounting Plaintiff's allegations, the undersigned cannot say that he would have made the same ultimate conclusions had he properly considered Plaintiff's fibromyalgia diagnosis.  Thus, remand is the appropriate remedy.

B.    Finding that Plaintiff Could Return to Her Past Relevant Work of Other Work[11]

The ALJ concluded that Plaintiff retains the RFC to perform a "minimally restricted range of light work," which does not preclude the performance of her prior work as a cashier (Tr. 19). Plaintiff contends, however, that the ALJ erred because he found that Plaintiff was capable of

---

[11]Despite the undersigned's recommendation that this action be remanded, the court finds it appropriate to address some of Plaintiff's remaining arguments.

standing and walking "for just four hours in an 8-hour workday," but a cashier job requires at least six hours of standing and walking (*see* Doc. 11 at 10).

The ALJ's specific RFC finding, in pertinent part, was as follows:  in an eight-hour workday, Plaintiff could stand and walk for four hours, and she could sit for at least four hours, provided she has the option to alternate between sitting and standing to accommodate her subjective symptoms (Tr. 17).  Thus, the ALJ's findings are inconsistent if a cashier job indeed requires at least six hours of standing and walking.  In support of her contention that it does, Plaintiff has referred the court to listing No. 211.462–018 in the Dictionary of Occupational Titles (DOT), which is the listing identified by the VE for "cashier/wrapper," a light, semiskilled job (*see* Doc. 11 at 10, Ex. A; Tr. 271).  However, a review of the listing does not indicate that the job necessarily requires at least six hours of standing and walking (*see* Doc. 11, Ex. A).  The listing characterizes the job as "light," which as noted above (*see supra*, n.2; 20 C.F.R. § 404.1567(b)), requires a "good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls," or as stated in the DOT listing, a light job "(1) [] requires walking or standing to a significant degree; or (2) [] it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls" (Doc. 11, Ex. A) (emphasis added).  Thus, the court cannot conclude that a light job necessarily requires "at least six hours of standing or walking"; it potentially requires a "good deal" of standing or walking, or standing or walking "to a significant degree."  Alternatively, by either definition, a light job might require "sitting most of the time," and correspondingly, limited walking and standing.  Thus, the ALJ's RFC finding is not inconsistent with his finding that Plaintiff has the ability to perform "light" work as a cashier, as that term is defined in the Regulations or the DOT listing.

Plaintiff notes, however, that Social Security Ruling 83–10, found at 1983 WL 31251, states that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  However, the Ruling states that approximately six hours of standing and walking are required, not exactly six hours.  Moreover, the Ruling concerns claimants who have been deemed capable of performing the "full range of light work."  Here, the ALJ found that Plaintiff was capable of performing a restricted range of light work, and relying on the VE's testimony (namely, that some cashier positions accommodate Plaintiff's need to alternate between sitting and standing (*see* Tr. 272)), the ALJ found that Plaintiff could perform that specific

job, not the full range of light work.  Thus, the court cannot conclude that the ALJ erred in this regard, especially considering that Plaintiff did not challenge the VE's testimony through cross-examination (*see* Tr. 270–74).  *See* White v. Astrue, 240 Fed. Appx. 632, 634 (5th Cir. 2007) (citing Carey v. Apfel, 230 F.3d 131, 146–47 (5th Cir. 2000) ("claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing")).

The ALJ found further found, based on the testimony of the VE, that if Plaintiff could not return to her past work as a cashier, there were other jobs available in the economy she could perform, including the "sedentary"[12] jobs of order clerk (DOT #209.567–104),[13] call out operator (DOT #237.367–014), and pari-mutuel ticket taker (DOT #219.587–101), as well as the "light" job of toll collector (DOT #211.462–038) because those jobs accommodated Plaintiff's need for a "sit/stand" option (*see* Tr. 18–19, 272–73; Doc. 11 at 11–12).  Plaintiff contends that the ALJ erred, and again bases her argument on the ALJ's RFC determination, stating that "[a]n individual who is limited to *four hours* of standing/walking *and four hours* of sitting cannot, in fact, perform the full range of either sedentary or light work" (Doc. 11 at 12) (emphasis in original).  Like before, but this time in regard to "sedentary" jobs, Plaintiff has referred the court to a Social Security Ruling (96–9p), which is found at 1996 WL 374185 (*see* Doc. 11 at 12, n.8), and in pertinent part states, "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday" (emphasis added).  Initially, however, the court notes that the ALJ did not find that Plaintiff could perform the full range of sedentary (or light) work; he specifically noted that Plaintiff was limited because of her need for a

---

[12]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567(a)

[13]Sedentary work, as defined by the DOT, involves "sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." (*see, e.g.*, DOT #209.567–014).

sit/stand accommodation, and he relied on the VE's unchallenged testimony that the identified jobs were jobs with the necessary accommodation, and correspondingly, were jobs Plaintiff could perform.  Moreover, the Ruling cited by Plaintiff again uses the word "approximately" as opposed to "exactly" in noting the amount of sitting that is required in a sedentary job.  Furthermore, the Ruling cited by Plaintiff continues and states that "[a]n individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically . . . . .  It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work."  1996 WL 374185 at *7.  In the instant case, the ALJ did just that — he consulted a VE to determine the available jobs that Plaintiff could perform, and the VE's testimony was not challenged on cross-examination or by any other manner.  *See* White, 240 Fed. Appx. at 634.  For all of these reasons, the undersigned concludes that the ALJ's findings are not inconsistent.  Nevertheless, upon remand the ALJ's questions (if any) to a VE should include any additional limitations, related to Plaintiff's fibromyalgia, that may be found to exist.

C.    Evaluation of Plaintiff's Depression

Lastly, Plaintiff contends the ALJ failed to properly evaluate her depression (Doc. 11 at 19–25).  In pertinent part, Plaintiff asserts that the ALJ erred by not following the required technique for evaluating mental impairments and erred in his evaluation of the opinions of Dr. Hord and Dr. Billingsley (*id.*).

The Regulations require that mental impairments be evaluated in accordance with 20 C.F.R. § 404.1520a, which describes the "special technique" requiring the ALJ to first evaluate "your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s). . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings . . . ."  20 C.F.R. § 404.1520a(b)(1).  The ALJ must then evaluate the degree of functional loss resulting from the impairment in the four areas of:   (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c). The regulations set forth a five-point scale to rate the degree of limitation in the first three functional areas (none, mild, moderate, marked, and extreme) and a four-point scale to rate the degree of

limitation in the fourth functional area (none, one or two, three, four or more).  If the degree of limitation in the first three areas is "none" or "mild," and "none" in the fourth area, an ALJ may properly find that a mental impairment is non-severe, provided there is no evidence to the contrary. *See* 20 C.F.R. § 404.1520a(d)(1).  If an ALJ finds a mental impairment severe, however, the ALJ must then determine whether the impairment meets or is equal to a listed mental impairment. Finally, the ALJ's written decision must incorporate pertinent findings and conclusions based on use of the special technique, and the ALJ's decision "must include a specific finding as to the degree of limitation in each of the functional areas."  20 C.F.R. § 404.1520a(e)(2).

Here, the ALJ determined that Plaintiff's depression is a severe impairment, meaning that it "significantly limit[s]" her mental ability to do basic work activities (Tr. 14).  *See* 20 C.F.R. § 404.1521.  The ALJ further considered whether Plaintiff's depression meets the requirements of a listed impairment, and in finding that it does not, he determined that Plaintiff has "less than marked" limitations in daily activities, social functioning, and concentration, persistence and pace, and no evidence of decompensation in work or work-like settings (Tr. 16).

Thus, as noted by the Commissioner (*see* Doc. 13 at 5), the ALJ "substantially complied" with the Regulations by addressing the four areas of functional limitations.  However, the Regulations state that the ALJ must include a specific finding as to the degree of limitation in each of the functional areas.  Although the ALJ made a specific finding as to the fourth area of functional limitation (i.e., he found "no" repeated episodes of decompensation), he found "less than marked limitations" in the first three areas instead of specifically noting that those limitations were "none, mild, or moderate."  Although this error might be deemed harmless in another case, as "less than marked limitations" support the ALJ's finding that Plaintiff's depression fails to meet or equal a listed impairment (*see, e.g.*, Listing 12.04 (Affective Disorders)), in light of the recommendation that this case be remanded for other reasons, the undersigned would further recommend that the ALJ reevaluate Plaintiff's depression and include specific findings in the opinion as to each area of functional limitation.[14]

---

[14]In light of the foregoing, the court need not decide whether the ALJ erred in his evaluation of the opinions of Dr. Hord or Dr. Billingsley.  The ALJ should be directed to entirely reconsider the severity of Plaintiff's mental impairment.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to remand this case to the Administrative Law Judge for further proceedings consistent with this report and recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this 13th day of February 2008.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**